

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. WR-71,070-03

### EX PARTE STEPHEN DALE BARBEE, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. C-213-W011571-1004856-C FROM THE 213TH DISTRICT COURT
### TARRANT COUNTY

WALKER, J., filed a concurring opinion.

### CONCURRING OPINION

Today, the Court rejects Stephen Dale Barbee, Applicant's, third application for habeas corpus relief on the basis that it is procedurally barred. The Court decides that *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018), does not constitute a new legal basis for relief because it was a logical extension of *Florida v. Nixon*, 543 U.S. 175 (2004), based on the factual distinctions—not legal ones—between the two cases.

I disagree. *McCoy* could not have been reasonably formulated by factually distinguishing *Nixon*. An argument factually distinguishing *Nixon* is an argument that counsel's performance was so deficient that prejudice, required by *Strickland v. Washington*, 466 U.S. 668 (1984), should be

presumed under *United States v. Cronic*, 466 U.S. 648 (1984). This was illustrated by Applicant's previous applications in which he challenged the effectiveness of counsel's representation and tried to distinguish *Nixon* such that counsel's performance would be presumptively prejudicial under *Cronic*.

*McCoy* was not a logical extension of *Nixon*, an ineffective assistance of counsel case. *McCoy* expressly disclaimed reliance on ineffective assistance of counsel case law under *Strickland* and *Cronic*, and *Nixon* is part of that case law. Instead, *McCoy* was concerned with the defendant's autonomy under the principles of *Faretta v. California*, 422 U.S. 806 (1975). Yet *McCoy* could not have been reasonably formulated from relevant case law such as *Faretta* or its progeny. *McCoy* constitutes a new legal basis.

However, I agree with the majority that Applicant's latest claim does not overcome the statutory procedural bar for subsequent writs because Applicant fails to set out a *prima facie* case that trial counsel usurped his authority to set the goals of his defense. Applicant's evidence in the habeas record shows that he told counsel repeatedly that he was innocent; it does not show that he told counsel to pursue a defense of asserting innocence that counsel then overrode. Accordingly, I concur with the Court's decision to dismiss the application.

## I — The Procedural Bar to Subsequent Writ Applications

Because this is Applicant's third application for habeas relief, under article 11.071, § 5, of the Code of Criminal Procedure, the general rule would bar us from considering this subsequent application. *See* TEX. CODE CRIM. PROC. Ann. art. 11.071 § 5(a) ("If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application . . . ."). There are exceptions, however, and

Applicant claims that the new legal basis exception applies to his case. That exception applies if:

> the [subsequent] application contains sufficient specific facts establishing that: (1) the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application . . . .

*Id.* § 5(a)(1). A legal basis is previously unavailable:

> if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.

*Id.* § 5(d).

## II — *McCoy v. Louisiana*

Applicant claims, as his new legal basis, the Supreme Court's 2018 decision in *McCoy v. Louisiana*, which was handed down seven years after Applicant's previous application filed in 2011. *See Ex parte Barbee*, No. WR-71,070-02, 2013 WL 1920606 (Tex. Crim. App. May 8, 2013). In *McCoy*, the United States Supreme Court held "that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *McCoy*, 138 S.Ct. at 1505.

In *McCoy*, the defendant was charged with three counts of first-degree murder under Louisiana law for murdering his estranged wife's mother, stepfather, and son, and the prosecution gave notice that it would seek the death penalty. *Id.* at 1505–06. McCoy pled not guilty, insisting that he was out of the state at the time of the killings and that corrupt police killed the victims when a drug deal went wrong. *Id.* at 1506. Counsel concluded, however, that the evidence was so overwhelming that McCoy would be sentenced to death unless he conceded that he was the killer. *Id.* McCoy was furious when told of counsel's strategy. *Id.* McCoy was completely opposed and

instructed counsel to pursue an acquittal instead of conceding guilt. *Id.*

At the beginning of counsel's opening statement in the guilt phase of trial, counsel told the jury that McCoy committed the three murders. *Id.* McCoy testified in his own defense, maintaining his innocence and pressing his alibi. *Id.* at 1507. In closing argument, counsel again told the jury that McCoy was the killer, and on that issue counsel told the jury that the burden was taken off of the prosecution. *Id.* The jury found McCoy guilty of all three first-degree murder counts. *Id.* At the penalty phase, counsel repeated that McCoy was guilty but urged mercy in view of McCoy's mental and emotional issues. *Id.* The jury returned three death verdicts. *Id.* On appeal, McCoy argued that his constitutional rights were violated when the trial court allowed counsel to concede that McCoy committed the murders over his objection, but the Louisiana Supreme Court held that counsel had the authority to concede McCoy's guilt despite his opposition. *Id.*

The Supreme Court granted certiorari in view of the split between Louisiana on the one side and decisions by the Delaware and Kansas Supreme Courts on the other side over "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." *Id.* (citing *Cooke v. State*, 977 A.2d 803, 842–46 (Del. 2009), and *State v. Carter*, 14 P.3d 1138, 1148 (Kan. 2000)).

In deciding the issue, the Supreme Court began with the right to self-representation under *Faretta*. *Id.* at 1507–08 (discussing *Faretta*). Should a defendant choose to be represented by counsel, certain decisions, such as "what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence," are made by counsel, while other decisions, such as "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal," belong to the defendant. *Id.* at 1508 (citing *Gonzales v. United States*,

553 U.S. 242 (2008); and *Jones v. Barnes*, 463 U.S. 745 (1983)). The Supreme Court held, in

*McCoy*, that the decision to determine that the objective of the defense is to assert innocence is one

of the decisions that belong to the defendant:

> Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*.

*Id.* at 1508 (emphasis in original).

The issues in *McCoy* and in *Faretta*, *Gonzales*, and *Barnes* relate to which decisions belong

to the defendant and which decisions belong to counsel, not whether counsel was effective in

performing his duties. *See Faretta*, 422 U.S. at 807 (self-representation); *Gonzales*, 553 U.S. at 253

(decision of whether to waive Article III judge at voir dire belongs to counsel); *Barnes*, 463 U.S. at

751 (decision of which nonfrivolous claims to assert on appeal belongs to counsel). Not surprisingly,

then, the Supreme Court declared in *McCoy* that:

> Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), to McCoy's claim.

*McCoy*, 138 S.Ct. at 1510-11.

### III — *Florida v. Nixon*, *Strickland*, **and** *Cronic*

The legal theory behind *McCoy*—a defendant's autonomy to decide that the objective of his

defense is to assert innocence—is completely different from the legal theory behind *Florida v.*

*Nixon*. The legal theory behind *Nixon* is that of *Strickland v. Washington* and *United States v.*

*Cronic*, which were concerned with ineffective assistance of counsel. Normally, a defendant alleging that he received ineffective assistance of counsel must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

*Cronic*, decided the same day as *Strickland*, provides an exception to the *Strickland* ineffective assistance standard. *Strickland*, 466 U.S. at 668 (decided May 14, 1984); *Cronic*, 466 U.S. at 648 (decided May 14, 1984); *Nixon*, 543 U.S. at 190 ("*Cronic* recognized a narrow exception to *Strickland*'s holding[.]"). Whereas under *Strickland* a defendant claiming ineffective assistance of counsel must make a two-prong showing of deficient performance and prejudice, *Cronic* recognized that there are circumstances in which prejudice is so likely that a defendant need not prove it. *Nixon*, 543 U.S. at 190. Stating the general rule that "because we presume that the lawyer is competent to provide the guiding hand that the defendant needs . . . the burden rests on the accused to demonstrate a constitutional violation," the Supreme Court in *Cronic* explained:

> There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.
>
> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. No specific showing of prejudice was required in *Davis v. Alaska* . . . because the petitioner had been "denied the right of effective cross-examination" which "'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'"
>
> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the

trial.

*Cronic*, 466 U.S. 658–60 (citations omitted).

In *Nixon*, the Supreme Court resolved the question of "whether counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial automatically render's counsel's performance deficient, and whether counsel's effectiveness should be evaluated under *Cronic* or *Strickland*." *Nixon*, 543 U.S. at 186–87. Under the facts of the case, the Supreme Court determined that counsel's concession of guilt did not reach the level of a complete failure to function as the client's advocate, such that *Cronic*'s presumption of prejudice applied. *Id.* at 190. Unlike most cases:

> the gravity of the potential sentence in a capital trial and the proceeding's two-phase structure vitally affect counsel's strategic calculus. Attorneys representing capital defendants face daunting challenges in developing trial strategies, not least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous. In such cases, "avoiding execution [may be] the best and only realistic result possible."

> Counsel therefore may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course. In this light, counsel cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade." Renowned advocate Clarence Darrow, we note, famously employed a similar strategy as counsel for the youthful, cold-blooded killers Richard Loeb and Nathan Leopold. Imploring the judge to spare the boys' lives, Darrow declared: "I do not know how much salvage there is in these two boys. . . . I will be honest with this court as I have tried to be from the beginning. I know that these boys are not fit to be at large."

*Id.* at 190–92 (citations omitted). Because conceding guilt in a capital case could be a matter of trial strategy, the Supreme Court held that counsel's performance should be evaluated under the normal ineffective assistance of counsel standard of *Strickland*. *Id.* at 192.

### IV — *McCoy* Could Not Have Been Formulated from *Nixon*

This Court today determines that the legal basis of Applicant's current *McCoy*-based claim was previously available because *McCoy* could have been reasonably formulated by distinguishing *Nixon* based on the factual distinctions—not the legal ones. But therein lies the rub. Distinguishing *Nixon* on the facts is an argument to apply *Cronic*.

The fact is, Applicant previously formulated an argument that tried to distinguish *Nixon*. In his first application, Applicant argued that he was effectively abandoned by trial counsel when counsel "confessed" Applicant's guilt to the jury during closing argument, resulting in a failure to subject the prosecution's case to meaningful adversarial testing and consequently a denial of counsel under *Cronic*.[1] Applicant pointed to *United States v. Swanson*, in which the Ninth Circuit held that counsel provides presumptively ineffective assistance, under *Cronic*, when he makes such a concession. *See United States v. Swanson*, 943 F.2d 1070, 1074 (9th Cir. 1991). In Applicant's proposed conclusions of law, he further argued that *Nixon*, in which the Supreme Court held that counsel's failure to obtain express consent to such a strategy was not presumptively ineffective under *Cronic*, should be distinguished. *See Nixon*, 543 U.S. at 190–91. Specifically, his proposed conclusions of law stated his case differed from *Nixon* because:

> 11. First, when counsel in *Nixon* informed his client of the proposed strategy of conceding guilt, counsel "failed to elicit a definitive response," from the client, thus by implication consenting to the strategy proposed by counsel. 543 U.S. at 186. In contrast to *Nixon*, after his recantation of his allegedly coerced confession, Mr. Barbee consistently maintained his innocence, notwithstanding his counsel's disbelief

---

[1] The first application also made two *Strickland* ineffectiveness of counsel claims centered around the supposed failure of counsel to properly challenge Applicant's video recorded confession and in counsel's supposed failure to call certain witnesses in mitigation. Finally, Applicant claimed a *Brady* violation from the State's supposed failure to provide a full, unaltered copy of Applicant's video recorded confession.

in Mr. Barbee's claim. *See* State's Answer at 39, Affidavit of William Ray and Tim Moore at 6, Affidavit of Amanda Maxwell at 4.[2]

In his second application (his first subsequent application), Applicant asserted, as his fourth claim, that trial counsel provided ineffective assistance during trial. His fourth claim was itself subdivided into four separate sub-claims. The first sub-claim alleged that he was effectively abandoned by counsel, under *Cronic*, because counsel failed to present medical and neuropsychological evidence that would have supported his innocence. The second sub-claim alleged ineffective assistance under *Cronic* for the same reason stated in the first application: trial counsel effectively abandoned him and failed to subject the prosecution's case to meaningful adversarial testing by "confessing" his guilt to the jury in closing argument. The third and fourth sub-claims asserted that counsel provided ineffective assistance under *Strickland* for failing to explain to the jury the significance of phone records admitted as evidence and for failing to object to testimony provided by a pair of coroners as prejudicially speculative. Applicant's fourth claim, related to trial counsel's alleged ineffective assistance under both *Cronic* and *Strickland*, was dismissed as subsequent.[3]

---

[2] Applicant's Proposed Findings of Fact, Conclusions of Law and Order, Clerk's R. 243, *Ex parte Barbee*, WR-71,070-01. Applicant also pointed to differences during the punishment phase of trial:

> 13. Second, unlike counsel in *Nixon* who admitted his client's guilt in order to pursue a vigorous mitigation case, Mr. Barbee's counsel totally abdicated their duty to present any meaningful mitigation, based upon the questionable premise that because he refused to "accept responsibility," they were somehow relieved of their legal duty to try and keep their client alive, despite the fact that they were the ones who admitted his responsibility for the murders in the first place.

*Id.* at 244.

[3] The second application for habeas relief raised twenty-one claims, and we dismissed all but the second, which argued that Applicant was deprived of due process and a fair trial because his trial attorneys had a conflict of interest. After remand and a hearing, we denied relief. *Ex parte*

As described above, then, the pertinent claims made in the previous applications complain of trial counsel's supposed "confession" of guilt to the jury during closing argument. Applicant's current claim for habeas relief under *McCoy* also complains of the same "confession" by counsel during closing argument. They involve the same factual basis.

But the legal basis is not the same. A *Nixon* argument, which is an ineffective assistance of counsel argument, is not a *McCoy* argument. In *McCoy*, the Supreme Court explicitly said:

> Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), to McCoy's claim.

*McCoy*, 138 S.Ct. at 1510-11. That should be the end of it. Although factually similar, *Nixon* and *McCoy* are legally dissimilar, and a *McCoy* argument could not be reasonably formulated by distinguishing *Nixon* on the facts. That kind of argument would be *Cronic*-based. Although a *Cronic*-based argument would identify the error as a structural one just as Applicant's current *McCoy*-based argument does today, a *Cronic*-based argument asserts that the error is structural for a different reason. To some extent, all structural error affects the framework in which the trial proceeds. *Id.* at 1511. Ineffective assistance of counsel under *Cronic* is structural because, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, the adversary process itself becomes presumptively unreliable. *Cronic*, 466 U.S. at 659. Conversely, *McCoy* error is structural for at least two reasons identified by the Supreme Court in *McCoy*: (1) to protect "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty"; and (2) the effects of the error are too hard to measure. *McCoy*, 138 S.Ct.

---

*Barbee*, No. WR-71-070-02, 2013 WL 1920686 (Tex. Crim. App. May 8, 2013) (not designated for publication).

at 1511 (quoting *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1908 (2017)). "[C]ounsel's admission of a client's guilt over the client's express objection . . . blocks the defendant's right to make fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." *Id.* The reason for protections provided in a *Cronic* claim are very different from the reasons for protections provided in a *McCoy* claim. Furthermore, a *Cronic* claim is very different from a *McCoy* claim because *Cronic* is an ineffective assistance of counsel claim and *McCoy* is an autonomy claim. The *Cronic* opinion makes no mention of autonomy, and *McCoy* makes no mention of ineffective assistance of counsel except to say that it does not apply. *Id.* at 1510–11. I cannot agree with the majority that *McCoy* could have reasonably formulated by distinguishing *Nixon*.

Indeed, presumptively ineffective assistance of counsel under *Cronic* and overriding the defendant's objectives under *McCoy* do not necessarily overlap. Counsel could be effective under *Cronic* because counsel has subjected the prosecution's case to meaningful adversarial testing by cross-examining the State's witnesses and arguing to the jury why it should render a verdict more favorable to the defendant than that sought by the State. However, if those decisions are contrary to the defendant's objective of asserting innocence, they are nevertheless structural errors under *McCoy*. For example, in *McCoy* and similar cases in which the government seeks the death penalty, where counsel concludes that there is overwhelming evidence of guilt, counsel's best option to avoid the death penalty may be to concede the question of guilt. *See id.* at 1506. If the defendant's objective is to claim innocence despite the evidence, counsel's strategy overrides the defendant's objective of asserting innocence and violates *McCoy*, even though it would not be ineffective under *Strickland* and *Cronic*.

Because a defendant may well have objectives that are incongruent with presenting an effective defense for himself, it is no surprise that the Supreme Court clearly stated that ineffective assistance case law under *Strickland* and *Cronic* was inapplicable in *McCoy*. *Id.* at 1510–11 ("Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of counsel jurisprudence, *Strickland v. Washington*, . . . or *United States v. Cronic*, . . . to McCoy's claim."). This statement, while not strictly a holding, was a requisite component of the analysis and should be determinative.

Accordingly, *McCoy* is not a logical extension of *Nixon* based on the factual differences between them. An argument that *Nixon* should be distinguished on its facts, such that structural error has occurred, is an argument that counsel's performance was deficient and, under *Cronic*, presumptively prejudicial. *McCoy* presents a completely different legal theory, that counsel overrode the defendant's autonomy to decide that the objective of his defense was to assert innocence. *McCoy* could not have been reasonably formulated off of *Nixon*.

### V — *McCoy* Could Not Have Been Reasonably Formulated

As explained above, the *McCoy* right—the defendant's autonomy to decide that the objective of his defense is to assert innocence—was founded upon *Faretta*, not *Strickland* or *Cronic* or *Nixon*. But *McCoy* could not have been reasonably formulated from *Faretta*. *Faretta* itself did not hold that a defendant has a right to decide to assert innocence. Instead, *Faretta* held that a defendant has a constitutional right of self-representation and he may proceed to defend himself without counsel when he voluntarily and intelligently elects to do so. *Faretta*, 422 U.S. at 807.

Instead of being directly derived from *Faretta*, the *McCoy* right was implied by one of the underlying principles of *Faretta*, "the fundamental legal principle that a defendant must be allowed

to make his own choices about the proper way to protect his own liberty." *McCoy*, 138 S.Ct. at 1508–09 (quoting *Weaver*, 137 S.Ct. at 1908); *see also id.* at 1508–09 (quoting *Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 165 (2000) (Scalia, J., concurring) ("Our system of laws generally presumes that the criminal defendant, after being fully informed, knows his own best interests and does not need them dictated by the State.")).

Those choices, until *McCoy* was decided, were limited to "certain fundamental decisions that the criminal justice system reserves for him to make personally." *Turner v. State*, 422 S.W.3d 676, 690–91 (Tex. Crim. App. 2013) (citing *Barnes*, 463 U.S. at 751). Those decisions include whether to plead guilty, whether to waive the right to a jury trial, whether to testify on one's own behalf, and whether to forego an appeal. *McCoy*, 138 S.Ct. at 1508; *Barnes*, 463 U.S. at 751. The decisions that belonged to a defendant did not include the autonomy to decide that the objective of the defense is to assert innocence. Instead, other choices such as what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence were left to counsel. *Gonzales*, 553 U.S. 248–49 (quoting *New York v. Hill*, 528 U.S. 110, 115 (2000)). When Applicant filed his previous applications for habeas relief, trial counsel's decision to concede guilt, as a strategic decision to avoid the death penalty, could easily be classified as a decision about which arguments to pursue.

In *McCoy* itself, several members of the Supreme Court felt that defendant's right to autonomy to decide that the objective of the defense is to assert innocence was "new." Justice Alito's dissent, joined by Justices Thomas and Gorsuch, considered what the majority did as "having discovered a new right," *McCoy*, 138 S.Ct. at 1517 (Alito, J., dissenting). In Alito's view, the Supreme Court decided the "case on the basis of a newly discovered constitutional right." *McCoy*,

138 S.Ct. at 1518. Though this may be true as a matter of Supreme Court jurisprudence, Justice Alito was perhaps too harsh, because *McCoy* recognized a split between the states and adopted the prevailing view.

Recognizing the factually similar case of *Florida v. Nixon*, the Supreme Court explained that *Nixon* was different because Nixon "was generally unresponsive" during discussions of trial strategy, and "never verbally approved or protested" counsel's proposed approach to admit guilt, and he complained only after trial. *McCoy*, 138 S.Ct. at 1509 (discussing *Nixon*, 543 U.S. at 181, 185). McCoy, in contrast, opposed counsel's assertion of guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court. *McCoy*, 138 S.Ct. at 1509. In support of this distinction, the Supreme Court cited *Cooke*, in which the Delaware Supreme Court similarly distinguished *Nixon* because:

> [i]n stark contrast to the defendant's silence in that case, Cooke repeatedly objected to his counsel's objective of obtaining a verdict of guilty but mentally ill, and asserted his factual innocence consistent with his plea of not guilty.

*McCoy*, 138 S.Ct. at 1509 (quoting *Cooke v. State*, 977 A.2d 803, 847 (Del. 2009)). Relying on the Delaware *Cooke* opinion, Kansas's *Carter* opinion, and Colorado's *Bergerud* opinion, the Supreme Court concluded, at the very end of Section II of its opinion, that:

> In each of the three cases, as here, the defendant repeatedly and adamantly insisted on maintaining his factual innocence despite counsel's preferred course: concession of the defendant's commission of criminal acts and pursuit of diminished capacity, mental illness, or lack of premeditation defenses. These were not strategic disputes about whether to concede an element of a charged offense, they were intractable disagreements about the fundamental objective of the defendant's representation. For McCoy, that objective was to maintain "I did not kill the members of my family." In this stark scenario, we agree with the majority of state courts of last resort that counsel may not admit her client's guilt of a charged crime over the client's intransigent objection to that admission.

*McCoy*, 138 S.Ct. at 1510 (discussing *Cooke*, 977 A.2d 803; *People v. Bergerud*, 223 P.3d 686 (Colo. 2010); and *State v. Carter*, 14 P.3d 1138 (Kan. 2000)) (citations omitted).

It is true that the Supreme Court, in *McCoy*, pointed out the factual differences between *Nixon*, the state cases, and the case before it. Yet in doing so, the Supreme Court did not conclude that the differences meant that presumptive prejudice under *Cronic* applied. To the extent the Supreme Court discussed and distinguished *Nixon*, it is important to remember that *Nixon* was concerned with whether counsel, who employs a strategy of conceding guilt without obtaining the express consent of the defendant, provided presumptively ineffective assistance of counsel under *Cronic*. *Nixon*, 543 U.S. at 178. The Supreme Court held that counsel in such a case would not be deemed presumptively ineffective, and the defendant would have to show prejudice under the *Strickland* standard. *Id.* at 192. The effectiveness or ineffectiveness of counsel is wholly irrelevant to the issue the Supreme Court was concerned with in *McCoy*—which decisions belong to the defendant and which decisions belong to the lawyer. *See McCoy*, 138 S.Ct. at 1510–11 ("Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, *Strickland* . . . or *Cronic*, to McCoy's claim.").

Under a fair reading of *McCoy*, the Supreme Court declared that the defendant has a right of autonomy to decide that the objective of his defense is to assert innocence by referencing the fundamental principles of *Faretta* and by identifying the split between Louisiana on the one side and Delaware, Kansas, and Colorado on the other side and opting to adopt the latter position stated in *Cooke*, *Carter*, and *Bergerud*. *See id.* at 1507 ("We granted certiorari in view of a division of opinion among state courts of last resort on the question whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection.").

Although *McCoy* has its roots in *Faretta* and resolved a split among various states, *McCoy* is the case that recognizes the autonomy-right in the first place. Accordingly, not only could Applicant not have *reasonably* formulated the autonomy-based *McCoy* argument based on *Nixon*, as the majority suggests, he could not have reasonably formulated the autonomy-based *McCoy* argument based on a prior decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state. *McCoy* constitutes a new legal basis for habeas relief.

The majority's assertion that Applicant could have formulated the autonomy-based *McCoy* argument based on *Nixon* appears to be correct. However, I cannot agree that Applicant could have *reasonably* formulated the autonomy-based *McCoy* argument based on *Nixon* as the exception to the article 11.071 § 5 bar requires. The word *reasonably* is included in the statute for a reason. The question is whether, prior to *McCoy*, a reasonably competent Texas attorney representing Applicant would have read the *Nixon* opinion, thought of the possibility of expanding the *Nixon* ineffective assistance of counsel holding to an autonomy issue, contemplated that this Court or the Supreme Court of the United States may buy the argument under the facts of Applicant's case even though no Texas Court or the Supreme Court of the United States had ever done so, and then come to the conclusion that making the argument would be prudent. Again, whether an argument can be formulated and whether an argument can be *reasonably* formulated are very different. As pointed out by the majority in this case, *Carter* and *Cooke*, both state supreme court cases, predicted the United States Supreme Court's holding in *McCoy*. But, would a reasonable, competent, and prudent attorney representing Applicant prior to *McCoy* have, even after contemplating a *McCoy*-esque argument, then researched case law from every state court in the United States to back up an idea that

had, at best, a minuscule chance of success? While Appellant could have formulated a *McCoy*-esque argument as was done in *Cooke* out of Delaware, *Carter* out of Kansas, and *Bergerud* out of Colorado, decisions by courts of appellate jurisdiction of other states, he could not have *reasonably* done so. The attempt would have been destined to fail because it would have been based on case law not included in § 5(d). *See, e.g.*, *Ex parte Medellin*, 223 S.W.3d 315, 352 (Tex. Crim. App. 2006) (dismissing habeas corpus application as subsequent where the claimed legal bases, a decision of the International Court of Justice and a Presidential memorandum, were not final decisions of a court listed in § 5(d), even though they were not available at the time of the previous application).

### VI — No Prima Facie Case

However, it is not enough for a subsequent application for habeas relief to invoke a new legal basis, the application must also allege sufficient specific facts that, if true, entitle him to relief. *Ex parte Maldonado*, 688 S.W.2d 114, 116 (Tex. Crim. App. 1985); Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a). As discussed, *McCoy* holds that a defendant has a right of "[a]utonomy to decide that the objective of the defense is to assert innocence." *McCoy*, 138 S.Ct. at 1508; *see also McCoy*, 138 S.Ct. at 1505 ("We hold that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experience-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty."). While *McCoy*'s full scope has yet to be determined by the Supreme Court, I believe that, at a minimum, *McCoy* requires a showing that the defendant told counsel that he wants to pursue a strategy of asserting innocence.

While Applicant's application for habeas relief and his brief do not allege that Applicant told his attorneys that he wanted to pursue an innocence defense, Applicant, in his application for habeas relief and in his brief, asserts that he had an objective to maintain innocence and counsel overrode

that objective by conceding guilt. The evidence he points to in order to support that claim, however, does not go so far.

Applicant points to the fact that he unsuccessfully sought to have counsel removed, similar to the unsuccessful pre-trial attempt to remove counsel in *McCoy*. *See McCoy*, 138 S.Ct. at 1506. In support of this, Applicant provides copies of two letters he sent to the trial court. The first letter states that "some serious issues" have occurred between Applicant and counsel, and "[t]here is a complete break-down in communication."[4] The letter complains that counsel is failing to keep him advised of the proceedings. The letter also states that Applicant is unable to assist in his defense due to a head injury and migraines. Finally, the letter states that counsel informed him of their heavy case loads, and he is afraid that counsel would not have the time to handle his case properly. Applicant's second letter to the trial court only states that "[t]here has and continues to be a serious breakdown in communication."[5] Neither letter even implies that Applicant wished to pursue an innocence strategy that counsel was overriding.

Letters aside, Applicant points to evidence that he claims shows counsel was aware of his desired objective. In a joint affidavit in response to Applicant's first application for habeas relief, counsel stated:

- Applicant "constantly stated that Ron Dodd was the real killer" and "was steadfast in his assertion that he was innocent;"[6]

- Applicant "took the position that Ron Dodd killed Lisa and Jayden

---

[4] Clerk's R. 225.

[5] *Id.* at 228.

[6] *Id.* at 234.

Underwood and . . . was not present when that happened;"[7]

- Applicant "maintained that he was completely innocent" and "refused to accept any responsibility;"[8] and

- "It was counsel's decision to call this case an accident, because the 'Ron Dodd did it' theory just wasn't going to work, and had not worked in this case."[9]

A memorandum of understanding prepared by counsel before trial stated that:

- "Client has maintained his innocence to attorneys since the date of appointment."[10]

And at an evidentiary hearing held on Applicant's second application for habeas relief:

- Counsel testified that Applicant "had told me he was innocent" "all along;"[11] and

- Co-counsel confirmed that Applicant told him "all along that he was innocent."[12]

While Applicant's evidence supports his claim that he repeatedly told counsel that he was innocent, the evidence shows nothing of whether Applicant actually told them to pursue a strategy of asserting innocence at trial. Instead, at the evidentiary hearing counsel testified:

Q. Did you have Mr. Barbee's permission to tell the jury that?

. . .

---

[7] *Id.* at 231.

[8] *Id.* at 235, 236.

[9] *Id.* at 234.

[10] *Id.* at 239.

[11] *Id.* at 299.

[12] *Id.* at 302.

A. Okay. Your question is, did I tell Mr. Barbee or did I ask him if I could do that?

Q. Yes.

A. We had a conversation on February 21st, which was, I believe the morning of trial. I'm talking about 2006. And I had typed up a memo and I showed it to him, and he didn't want to sign it but we went over it. And the gist of the memo was that that was the only way we could get through this and him be found not guilty was that we take that position.

And it was not a -- it was not an agreement to get his permission; it was just my theory of the case. He didn't sign the memo but he had it explained to him.

So did I explicitly ask him if I could do that? The answer is no. Did he explicitly tell me he didn't want me to do it? The answer is no. It's no to that question, too.[13]

Finally, Applicant argues that even though a defendant's motivations are irrelevant to the autonomy right, counsel was aware of his motivation, heightening the importance of allowing him to make his own decisions. This is so because a defense psychiatrist told counsel that Applicant's chief concern was not disappointing his mother and that:

[Applicant] appeared fixated on "how his mother will view him" . . . He even went so far as to say that he would rather be executed than have his mother see him plead guilty to the charges.[14]

If Applicant's true objective of his defense was to avoid disappointing his mother by not pleading guilty, then counsel met and achieved this objective: there was no guilty plea, and there was a jury trial.

In *McCoy*, the defendant explicitly and repeatedly opposed counsel's strategy of conceding guilt to avoid the death penalty. Applicant's evidence shows, at the most, that Applicant repeatedly told counsel he was innocent. No matter how emphatically he does so, this does not meet the

---

[13] *Id.* at 299.

[14] *Id.* at 262.

requirements of *McCoy*. I agree with the majority that Applicant's facts do not show a *prima facie McCoy* violation.

## VII — Conclusion

Under § 5(d), the legal basis of an applicant's claim is unavailable if it could not have been reasonably formulated based on relevant case law in the applicant's previous applications. The majority errs in determining that the legal basis of his current claim, *McCoy*, could have been formulated by distinguishing *Nixon* on its facts. The majority's conclusion ignores the fact that *Nixon* was an ineffective assistance of counsel case, and the issue in *Nixon* was whether presumptive prejudice under *Cronic* applied to the facts of that case. An argument distinguishing *Nixon* on its facts is an argument that presumptive prejudice under *Cronic* applies. This is clear from Applicant's own previous application making this very argument.

Ineffective assistance of counsel claims under *Strickland*, *Cronic*, and *Nixon* have different legal bases from and are not interchangeable with *McCoy*. Applicant's current *McCoy*-based claim asserts, not that counsel provided presumptively prejudicial ineffective assistance of counsel, but that counsel overrode his autonomy to decide that the objective of his defense is to claim innocence. Applicant could not have reasonably formulated his *McCoy* argument from relevant Supreme Court, federal appellate court, or Texas appellate case law. *McCoy* added a new entry to the list of decisions that belong to the defendant, and in doing so borrowed from Delaware, Kansas, and Colorado case law. A Texas habeas applicant, seeking to get past the procedural bar, is statutorily unable to rely upon other state court case law. I therefore disagree with the Court's conclusion that *McCoy* does not constitute a new legal basis for habeas relief.

Nevertheless, I agree with the majority that Applicant's claim fails to meet the exception to

the § 5 procedural bar because he did not instruct counsel to assert innocence at trial. For *McCoy* to actually apply to the situation at hand, it is necessary that, at the time of his trial, Applicant's objective of his defense was to assert innocence, that Applicant communicated this objective to counsel, and then counsel overrode Applicant's objective. Because Applicant's evidence in support of his claim for habeas relief shows, at the most, that Applicant repeatedly told counsel he was innocent, I concur with the Court's judgment in dismissing the application.

Filed: February 10, 2021
Publish